# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. _____

*In re Application of*

**iFINEX INC.**

      Applicant,

For the Issuance of a Subpoena for the Taking of a Deposition and the Production of Documents for use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782

---

## APPLICATION TO CONDUCT DISCOVERY PURSUANT TO 28 U.S.C. § 1782

---

Dated: April 13, 2020

*Shannon Wells Stevenson*
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, Colorado, 80202
Telephone:  303.892.9400
Facsimile: 303.893.1379
Email: shannon.stevenson@dgslaw.com

Michael Jason Lee
LAW OFFICES OF MICHAEL JASON LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
Telephone: 858.550.9984
Facsimile: 858.550.9985
Email: Michael@mjllaw.com

Christopher J. Beal
DILLON MILLER & AHUJA, LLP
5872 Owens Avenue, Suite 200
Carlsbad, California 92008
Telephone: 858.587.1800
Facsimile: 858.587.2587
Email: cbeal@dmalaw.com

*Attorneys for Applicant, iFINEX INC.*

4715119.1

**TABLE OF CONTENTS**

I.      INTRODUCTION ...............................................................................................................2

II.     STATEMENT OF FACTS ................................................................................................3

        A.      iFinex's Businesses ...............................................................................................3

        B.      Applicant's Agreement with Crypto Capital .......................................................5

        C.      Applicant Begins to Discover Crypto Capital's Malfeasance .............................6

        D.      Current, Ongoing Foreign Proceedings ...............................................................7

        E.      Crypto Capital's Use of Citibank Banking Accounts ..........................................9

III.    THE CONTEMPLATED DISCOVERY ......................................................................10

IV.     iFINEX'S LOCATION ...................................................................................................12

V.      THE APPLICATION SATISFIES SECTION 1782'S REQUIREMENTS ..................12

        A.      Applicant is an "Interested Person" ..................................................................13

        B.      The Requested Discovery is for Use in Conjunction with Proceedings Before
                Foreign Tribunals...............................................................................................14

        C.      Bank of Colorado Resides in and Can Be Found in the District of Colorado ....15

        D.      Discretionary Considerations Merit Granting This Application........................16

VI.     CONCLUSION................................................................................................................19

## I.      INTRODUCTION

Applicant iFinex Inc. ("iFinex" or "Applicant") seeks the assistance of this Court in obtaining discovery for use in foreign proceedings both currently ongoing and contemplated in Poland, Portugal, and the United Kingdom. In those proceedings, Applicant seeks to recover approximately $880,000,000 of funds which it had entrusted to an entity named Global Trade Solutions AG ("Global Trade"), doing business as "Crypto Capital."

Since 2014, but primarily in 2017-2018, Crypto Capital provided services as a payment processor to Applicant, transferring funds to and from Applicant and its customers. Since no later than December 2018, however, Crypto Capital has failed and refused to remit funds, claiming that its bank accounts located in Poland, Portugal, the United Kingdom, and the United States had been seized or frozen by various governmental authorities in each jurisdiction.

For this reason, Applicant (1) filed a claim with the National Prosecutor's Office in Poland seeking to recover funds in proceedings currently ongoing before that body; (2) filed an application for protective order with the Court of Cascais in the Judicial Court of Western Lisbon ("Court of Cascais") against Global Trade and two associated companies to prevent the dissipation of certain funds held in Portugal; (3) filed a separate application for protective order with the Court of Cascais against the individuals occupying leadership positions in Global Trade and the two other companies; (4) intends to initiate a legal suit for recovery of those funds before the same court; and (5) intends to initiate a legal suit for recovery of funds in those accounts before the High Court of Justice in London, United Kingdom.

Crypto Capital used a bank account with Citibank, N.A. ("Citibank") to accept certain deposits from Applicant's customers. The account was held in the name of "Global Trading

Solutions, LLC." Applicant has obtained information and documents from Citibank pursuant to

Section 1782 discovery authorized by the Central District of California. According to those

records, nearly $2,000,000 of customer funds were transferred from Citibank to an account held

with Bank of Colorado, the subject of the instant Application.

Through the instant Application, iFinex seeks the aid of this Court in taking discovery

from Bank of Colorado concerning this account, any related accounts, their ownership,

communications with individuals associated with the accounts, and similar information.

Applicant seeks this information for use in the foreign proceedings identified above, in which

Applicant seeks to substantiate its claims to hundreds of millions of dollars.

## II.      STATEMENT OF FACTS

### A.      iFinex's Businesses

iFinex operates a leading global virtual currency platform operating under the brand and

trade name of Bitfinex, specifically, on and through www.bitfinex.com. (Declaration of

Giancarlo Devasini ("Devasini Decl.") ¶ 2.) Bitfinex provides a technology platform for

customers—both business and individuals—to engage in the trade of digital tokens (e.g., bitcoin

and Ethereum) using U.S. dollars, Euros, British pounds, and/or Japanese yen. (*Id.*)

Before using Bitfinex's platform, customers must enter into a contract with Bitfinex

agreeing to their terms of service, which are publicly available on Applicant's website. (Devasini

Decl. ¶ 3.) Customers wishing to deposit fiat currency—such as U.S. dollars, Euros, British

pounds or Japanese yen—on the platform must go through an extensive due diligence process.

(*Id.*) Applicant also has in place standards to monitor transactions, assess risks, and file

Suspicious Activity Reports (commonly referred to as a SAR) and other reports required by applicable law. (*Id.*)

Customers who want to purchase virtual currency through Bitfinex using fiat currency must first deposit their funds into their Bitfinex account. (Devasini Decl. ¶ 4.) Once fiat is deposited, they may trade those funds for digital tokens with other users. They may then withdraw those digital tokens. They may, alternately, withdraw unused fiat currency from Bitfinex or fiat currency that is the proceeds from future trading. (*Id.*)

For these platforms to work, customers depend on Applicant's ability to receive and send fiat currency. This concept is similar, but not the same, to a customer of a U.S. financial institution having access to her money from a branch, on demand. (*Id.* ¶ 5.)

Until early 2017, customers who sought to deposit fiat currency into their Bitfinex account could do so by interbank wire transfer, transferring funds from their own bank accounts into certain bank accounts held by iFinex in Taiwan. In early 2017, however, certain U.S. banks successfully pressured Applicant's Taiwanese banks into discontinuing this arrangement. (Devasini Decl. ¶ 6.)

Without a readily available banking solution, iFinex turned to a third-party payment processor doing business as "Crypto Capital."[1] (Devasini Decl. ¶ 7.)

---

[1]     In early 2017, according to its website, Crypto Capital was owned and operated by a Panamanian entity named Crypto Capital Corp that has since been dissolved (in June 2018).  Sometime in 2018, Crypto Capital began holding itself out, including on its website www.cryptocapital.co, as being owned by a Swiss entity named Global Trade Solutions AG.  For purposes of clarity, Applicant will refer to the company as "Crypto Capital."

**B.      Applicant's Agreement with Crypto Capital**

Crypto Capital markets itself as enabling its customers to deposit and withdraw fiat funds instantly to certain virtual currency exchanges including, at the time, Bitfinex. (Devasini Decl. ¶ 8.) In late 2014, Crypto Capital agreed to act as a payment processor[2] for the Bitfinex exchange, although the large majority of processing activity did not commence until 2017. That is, when Bitfinex customers sought to deposit fiat currency into their Bitfinex accounts, Bitfinex would provide customers with banking details to which the deposits were to be remitted by bank wire, as well as certain identifiers to include in the wire details. Crypto Capital represented that the accounts receiving customer deposits were owned and operated by Crypto Capital or its related entities. (*Id.*)

Once Crypto Capital received funds transmitted, it would use the identifier to allocate deposits to a Bitfinex account and communicate receipt of the deposit to Bitfinex. (Devasini Decl. ¶ 9.) Generally, Bitfinex would log onto the Crypto Capital platform to confirm that the wire was received and approve the deposit receipt. At that point, the funds were made available to the Bitfinex customer on the Bitfinex platform. Pursuant to the parties' agreement, Crypto Capital would hold these funds on behalf of Bitfinex, but would also transfer funds to Bitfinex on demand. (*Id.*)

Customer withdrawals processed by Crypto Capital were handled similarly. (Devasini Decl. ¶ 10.) A Bitfinex customer would submit a withdrawal request to Bitfinex. Bitfinex would log onto the Crypto Capital platform and fill in the beneficiary details provided by the customer.

---

[2]      Broadly speaking, a "payment processor" is a third party that facilitates financial transactions between parties.

Bitfinex would then approve the withdrawal request and Crypto Capital would settle the withdrawal by remitting the funds to the Bitfinex customer from a bank account owned by Crypto Capital. (*Id.*)

As part of the parties' agreement, besides a nominal fee for each deposit or withdrawal, Crypto Capital charged no fee for these services to iFinex because it was able to earn substantial interest on the funds it held on Applicant's behalf in its accounts. (Devasini Decl. ¶ 11.)

### C.     Applicant Begins to Discover Crypto Capital's Malfeasance

From early 2017 through late 2018, Bitfinex customers transferred more than $1.5 billion to various bank accounts purportedly held or controlled by Crypto Capital. (Devasini Decl. ¶ 12.) By July 2018, the amount Crypto Capital held and owed to Applicant exceeded $1 billion. The reason for this large balance was largely two-fold: (1) an increasing interest in virtual currency trading and investment, leading to increasing amounts being transferred by Applicant's customers; and (2) institutional constraints on the amount of funds that could be transferred between Crypto Capital accounts and Applicant's bank accounts. (*Id.*)

During this time, Applicant's relationship with Crypto Capital generally operated well. (Devasini Decl. ¶ 13.) In or about March or April 2018, however, Applicant learned from news reports that Crypto Capital funds had been seized by authorities in Poland as part of an investigation into potential money-laundering. At the time, Crypto Capital acknowledged that its Polish bank accounts had been frozen, but claimed that none of Applicant's funds were affected by these actions. (*Id.*)

In or about late August 2018, however, Crypto Capital began representing that approximately $500 million of Applicant's funds in both Poland and Portugal were being "held

up" by regulators in both countries. (Devasini Decl. ¶ 14.) From then through November 2018, one of Crypto Capital's principals, Oz "Joseph,"[3] repeatedly reassured Applicant that its funds held in Poland and Portugal were on the verge of being released and that Crypto Capital was working diligently with local authorities to secure their release. (*Id.*)

In response to increasing pressure from Applicant and their attorneys for specific information concerning the banking accounts that had been purportedly frozen, Crypto Capital began providing additional information in the latter part of 2018. (Devasini Decl. ¶ 15.)

### D.      Current, Ongoing Foreign Proceedings

According to Crypto Capital: approximately $355,000,000 of Applicant's funds are being held in various currencies that were on deposit in accounts at Bank Spoldzielczy in Skierniewice, Poland. According to Crypto Capital, approximately $218,000,000 of Plaintiffs' funds are being held in various currencies in accounts at three separate Portuguese banks: Banco Português de Investimento ("Banco BPI"), Bankinter, S.A. ("Banco BIC"), and Caixa Geral de Depositos S.A. (Devasini Decl. ¶ 16.)

Since these and other subsequent disclosures, as well their own further investigation, Applicant has been able to confirm that the National Prosecutor's Office in Poland has seized certain funds held by Crypto Capital in Bank Spoldzielczy. (Devasini Decl. ¶ 17.) Applicant has filed a claim with the Prosecutor's Office as an "Injured Party" seeking to recover funds that Crypto Capital held in Poland on their behalf. (*Id.*) Applicant also filed a civil claim against a Polish entity affiliated with Crypto Capital that was the authorized holder of the accounts at issue

---

[3]      In 2019, Applicant subsequently learned that Mr. Joseph's last name was actually "Yosef." During Applicant's relationship with Crypto Capital, however, Yosef represented—both orally and in writing—that his name to was "Joseph."

located in Poland. Additionally, Applicant filed two criminal notifications against the representatives of the Polish entity affiliated with Crypto Capital concerning fraud and appropriation. (*Id.*)

With respect to the funds held in the Portuguese banks identified above, Applicant has filed an application for a protective order with the Court of Cascais against Global Trade and two other companies (Eligibility Criterion and MOGW) to prevent the dissipation of funds held with Caixa Geral de Depósitos, Banco BPI and Banco BIC. Applicant has also filed a separate application for protective order with the Court of Cascais against the principals of Global Trade and the two other companies. Applicant intends to initiate a legal suit for recovery of those funds with the same court (Devasini Decl. ¶ 18.)

Applicant has also learned that Crypto Capital maintained accounts with HSBC Bank PLC ("HSBC UK") in the United Kingdom. Applicant anticipates bringing a subsequent suit in the United Kingdom in order to recover the funds. (Devasini Decl. ¶ 19.)

To Applicant's understanding, however, Crypto Capital did not simply receive customer deposits into its various banking accounts and maintain those deposits with the initial bank receiving those funds. Rather, Crypto Capital subsequently transferred funds between and among various banks, including in Europe and the United States. In the U.S. alone, Applicant has information that Crypto Capital used accounts held not only at Bank of Colorado, but also Bank of America, Citibank, Enterprise Bank & Trust, HSBC, Stearns Bank, Sun Trust, TD Bank, Wells Fargo, and US Bank. (Devasini Decl. ¶ 20.)

Thus, in order to demonstrate Applicant's ownership of and entitlement to the various funds held in Poland, Portugal, and the United Kingdom, Applicant must be able to trace the

funds deposited by its customers through the fund transfers between and among the various banking accounts operated or used by Crypto Capital. Applicant also seeks information regarding the ownership and use of the accounts at issue, as well as communications between the banks and account holders and/or their representatives. (Devasini Decl. ¶ 24.)

### E.    Crypto Capital's Use of Citibank Banking Accounts

From approximately April to June 2018, Crypto Capital used a bank account ending in -9503 with Citibank to accept deposits from Applicant's customers. (Devasini Decl. ¶ 22.) The account was held in the name of Global Trading Solutions, LLC. Because the name of this LLC was similar to that of the entity that then owned Crypto Capital (Global Trade Solutions AG), Applicant believed the LLC to be an entity related to Crypto Capital. (*Id.*)

Since December 2018, Applicant has subsequently learned that Global Trading Solutions, LLC is wholly owned by an individual named Reginald Dennis Fowler. Prior to December 2018, Crypto Capital had never revealed Mr. Fowler's involvement in its operations and only admitted as much in or about late December 2018 and thereafter. (Devasini Decl. ¶ 23.)

According to information and documents obtained from Citibank pursuant to Section 1782 discovery authorized by the Central District of California, iFinex has also learned the following: In June 2018, nearly $2,000,000 of iFinex customer funds were transferred from the Citibank account ending in -9503 to a Bank of Colorado account ending in -3413. According to the wire transfer information obtained from Citibank, this Bank of Colorado account is held in the name of Eligibility Criterion, an entity owned or controlled by Fowler. Moreover, the wire transfer instructions indicated these transfers were "Intercompany Transfers."

### III.    THE CONTEMPLATED DISCOVERY

The contemplated discovery is narrowly tailored to the facts and circumstances surrounding the Bank of Colorado's involvement—knowingly or otherwise—in the events described in Section II, above. Applicant seeks the production of documents and the testimony of Bank of Colorado concerning the accounts used by the following entities and individuals to transfer and hold funds belonging to Applicant, any transfers of funds to or from those accounts, the manner in which Applicant's funds were used, the current location of Applicant's funds, as well as communications with Crypto Capital or its various affiliated entities and individuals:

- Crypto Capital Corp, a now-dissolved Panamanian entity that previously owned and operated the www.cryptocapital.co website.

- Global Trade Solutions AG, a Swiss entity that now owns and operates the www.cryptocaptital.co website.

- Ivan Manuel Molina Lee, one of Crypto Capital's principals. Mr. Molina is also a registered director of Global Trade Solutions AG.

- Ozzie Yosef a/k/a Ozzie Joseph, one of Crypto Capital's principals.

- Ravid Yosef, Mr. Yosef's sister. According to an April 2019 indictment brought by the U.S. Attorney for the Southern District of New York, Ms. Yosef opened and used numerous accounts at FDIC insured banks in order to provide banking services to cryptocurrency exchanges like Bitfinex. In doing so, the indictment alleges that Ms. Yosef falsely represented that the accounts would be used for real estate investment transactions.

- Reginald Dennis Fowler, an individual who provided Crypto Capital access to various banking accounts in Europe and the United States through various entities which he

owned or controlled. Prior to December 2018, Crypto Capital had never revealed Mr. Fowler's involvement in its operations and only admitted as much in or about late December 2018 and thereafter.

- Trent Dennis Fowler, a son of Reginald Dennis Fowler. According to banking records provided by Crypto Capital to iFinex, Trent Fowler is the registered account holder for at least one of the accounts used by Crypto Capital to receive deposits from Bitfinex customers.

- Global Trading Solutions, LLC, an entity Crypto Capital used to receive and disburse iFinex customer deposits. iFinex has subsequently learned that Global Trading Solutions, LLC is actually wholly owned by Mr. Fowler.

- G.T.S. Resources Limited, a United Kingdom entity that, according to Crypto Capital, is currently holding more than $304,000,000 of iFinex's funds with TCA Investment Bancorp & Trust (below). G.T.S. Resources Limited is also wholly owned by Mr. Fowler. In December 2018—after iFinex learned of Mr. Fowler's involvement with Crypto Capital—Mr. Fowler changed the corporate name of the entity to Spiral Global Development Limited.

- TCA Investment Bancorp & Trust Company, an entity claiming to hold more than $304,000,000 in funds on behalf of G.T.S. Resources Limited. Despite its name, however, TCA Investment Bancorp & Trust is not a bank and appears to have no physical presence. TCA Bancorp is operated by at least four principals: Katsuyoshi Iwanaga, Diane Fletcher, David Anthony Stafford, and Rondell Monroe.

- Eligibility Criterion and/or Eligibility Criterion Unip LDA, an entity owned or controlled by Fowler. After receiving iFinex customer funds to the Citibank account noted above, Fowler caused several millions of dollars of customer funds to be wire transferred to

various banking accounts held in the name of "Eligibility," "Eligibility Criterion," and "Eligibility Criterion Unip LDA." Each such transfer included a description as "Intercompany Transfer."

- Spiral Global Development, an entity owned or controlled by Fowler. Again, after receiving iFinex customer funds to the Citibank account, Fowler transferred millions of dollars of those funds to at least one Enterprise Bank account held in the name of Spiral Global Development.

- NLE Consulting Group, a Florida entity created in February 2018 and for which Mr. Fowler is registered as a Vice President. In March 2018, the entity applied for a fictitious name of "Global Trading Solutions," a name substantially similar to Global Trade Solutions AG, the entity that owns and controls the cryptocaptial.co website.

A copy of Applicant's proposed discovery is attached to the Devasini Declaration as **Exhibit "A."**

## IV.     IFINEX'S LOCATION

iFinex is incorporated in the British Virgin Islands with its principal place of business located in the Republic of China (Taiwan). (Devasini Decl. ¶ 2.)

## V.     THE APPLICATION SATISFIES SECTION 1782'S REQUIREMENTS

28 U.S.C. § 1782(a) provides:

The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made pursuant to ... the application of any interested person…

The fundamental purpose of § 1782 is to provide a procedure whereby a qualified applicant may obtain "federal-court assistance in gathering evidence for use in foreign tribunals."

*Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 247 (2004); *see Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244 (2d Cir. 2018). "Any interested person" includes litigants before foreign or international tribunals, and includes corporate entities as well as natural persons. *Id*. at 256; *see Akebia Therapeutics, Inc. v. FibroGen, Inc*., 793 F.3d 1108, 1109 (9th Cir. 2015).

The policy behind § 1782 is to "assist foreign tribunals in obtaining relevant information that the tribunals may find useful, but, for reasons having no bearing on international comity, they cannot obtain under their own laws." *Id.,* at 262. The "prima facie showing mandated by the statute is that the application be made (1) 'by a foreign or international tribunal' or 'any interested person,' (2) that it be 'for use in a proceeding in a foreign or international tribunal,' and (3) that the person or entity from whom the discovery is sought be a resident of or be found in the district in which the application is filed." *In re Bayer AG*, 146 F.3d 188, 193 (3d Cir. 1998); *Republic of Kazakstan v. Biedermann Int'l,* 168 F.3d 880, 881 (5th Cir. 1999).

## A.     Applicant is an "Interested Person"

As noted above and in the Devasini Declaration, Applicant is a party to current foreign proceedings occurring in Poland, Portugal, and the United Kingdom. As a party in foreign litigation, iFinex satisfies the "interested person" requirement of Section 1782. *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke Section 1782."); *see also John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132 (3d Cir. 1985) (a party to foreign litigation is an interested person under Section 1782).

**B.      The Requested Discovery is for Use in Conjunction with Proceedings Before Foreign Tribunals**

As discussed above, Applicant seeks discovery from the Bank of Colorado: (1) to establish Applicant's right to certain funds in proceedings before the National Prosecutor's Office in Poland; (2) to establish its right to enjoin the dissipation of certain funds in Portugal before the Court of Cascais, as well as their right to recover those funds in a subsequent suit before the same court; and (3) its right to recover certain funds held by HSBC in the United Kingdom before the High Court of Justice there.

While Section 1782 requires that the evidence sought be "for use in a proceeding in a foreign or international tribunal," the Supreme Court has rejected the view that "Section 1782 comes into play only when adjudicative proceedings are 'pending' or 'imminent.'" *Intel*, 542 U.S. at 259. Rather, it held that a foreign proceeding only had to be "within reasonable contemplation." *Id.*; *see also Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015) (rejecting argument that pre-litigation discovery sought via § 1782 required a showing that applicant could not commence foreign proceeding absent the discovery sought).

In deciding whether this requirement of § 1782 is met, the district court should ask whether "there [is] sufficient indication that a proceeding in court would eventuate in which the evidence gathered can be weighed impartially." *In re Letter of Request from Crown Prosecution Serv. Of United Kingdom*, 870 F.2d 686, 691 (D.C. Cir. 1989). Where the applicant sets forth the documents it desires, the information it expects to find, and the reasons it would use the documents, the court can reasonably conclude that a foreign proceeding is within reasonable contemplation. *In re Request for Assistance from Ministry of Legal Affairs of Trinidad &*

*Tobago*, 848 F.2d 1151, 1156 (11th Cir. 1988), abrogated on other grounds by *Intel*, 542 U.S. 241.

Here, certain foreign proceedings have commenced, as identified above. The fact that other contemplated foreign proceedings have not yet commenced, such as additional proceedings in Poland identified above, is of no moment. Indeed, in *Intel*, the Supreme Court held that "Section 1782(a) does not limit the provision of judicial assistance to pending [or imminent] adjudicative proceedings. 542 U.S. at 258. The *Intel* Court held that Section 1782(a) should be read only to require that it be "within reasonable contemplation" that the evidence sought would be used in a dispositive proceeding." *Id*. (citing *In re Crown Prosecution Serv*., 870 F.2d 686, 691 (emphasis added) ); *see also In re Letters Rogatory Issued by the National Court of First Instance in Commercial Matters N.23 of the Federal Capital of the Argentinean Republic*, 144 F.R.D. 272, 277 n. 4 (3d Cir. 1992)(rejecting argument that a "pending" proceeding is required under Section 1782); *In the Matter of the Application of Oxus Gold PLC For Assistance Before a Foreign Tribunal*, 2007 U.S. Dist. LEXIS 24061, at *18 (D.N.J. April 2, 2007)(requirements of Section1782 satisfied where applicant alleged that claim would be litigated in "near future").

Thus, this factor favors granting the requested discovery.

### C.      Bank of Colorado Resides in and Can Be Found in the District of Colorado

Pinnacle Bancorp does business as the Bank of Colorado, with Bank of Colorado's corporate headquarters at 1609 East Harmony Road, Fort Collins, Colorado 80525. Thus, Respondent is within this Court's jurisdiction and subject to its authority over the requested discovery sought by Applicant. (*See* Devasini Decl. ¶ 25.)

### D.     Discretionary Considerations Merit Granting This Application

In addition, certain discretionary factors that "bear consideration in a ruling on a § 1782 request" also favor granting the instant Application. *See, Intel,* 542 U.S. at 264-65. These include:

(1)     Whether the person from whom discovery is sought is a non-participant to the foreign proceeding thereby making the need for the aid more apparent;

(2)     The nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or court abroad to federal court judicial assistance;

(3)     Whether the § 1782 application for discovery is an attempt to circumvent the foreign proceeding or undermine foreign laws;

(4)     Whether granting discovery that is narrowly tailored is consistent with the aims of the statute to promote efficiency and reciprocity.

Here, each of these discretionary factors weighs in favor of granting the Application.

First, Applicant's need for the discovery from Bank of Colorado by means of § 1782(a) is heightened by the fact that it is not a party to the proceedings currently occurring or contemplated in Poland, Portugal, or the United Kingdom.

As the Supreme Court noted: "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel,* 542 U.S. at 264-65. As such, relief under § 1782(a) may not be warranted where the relevant tribunal does not need the assistance. *Id.* In contrast, here, Bank of Colorado possesses evidence relevant in the foreign proceedings, but will not be a party there. Indeed, Bank of Colorado will not be brought before

any foreign tribunal for the purpose of obtaining the evidence currently in their possession, nor is the discovery sought from it within the jurisdictional reach of the courts of Poland, Portugal, or the United Kingdom. Nonetheless, documents in its possession and its testimony are directly relevant to Applicant's claims in Poland, Portugal, and the United Kingdom. This weighs in favor of granting the Application.

Second, there is no reason to believe that the National Prosecutor's Office of Poland, the Court of Cascais, or the courts of the United Kingdom would be unreceptive to this Court's grant of the discovery sought. All three countries are also parties to the New York Convention. Therefore, there is no reason to believe that those courts would object to this Court's assistance with discovery that will, by providing information concerning the transfers of Applicant's funds, facilitate the foreign proceedings and the potential recovery of those funds.

Further, the courts have held that the liberal policy of granting assistance favors allowing a petitioner the discovery sought so that the foreign court itself may determine the admissibility or relevance of the evidence obtained. *See In re Euromepa S.A.*, 51 F.3d 1095, 1099-1100 (2d Cir. 1995) (explaining that "a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," and that "[a]bsent this type of clear directive, however, a district court's ruling should be informed by section 1782's overarching interest in 'providing equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects.'"); *In re Application of Grupo Qummam*, No. M 8-85 (DC), 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2005) ("The Mexican court, rather than this Court,

should decide whether the additional evidence is admissible, and it will be in a better position to do so if Qumma is permitted to conduct the requested discovery first.").

Third, the discovery is centrally relevant to the proceedings in Poland, Portugal, and the United Kingdom, and would not conflict with or circumvent any foreign proof-gathering restrictions. Courts have interpreted this discretionary factor as an inquiry into the petitioner's good faith: "[A] district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign-proof gathering restriction or other policies of a foreign country or the United States." *Intel,* 542 U.S. at 264-65; *see, also In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf,* Case No. Ml 9-88, 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006). Applicant's request here is made in good faith and not for purposes of harassment. *See, Brandi-Dohorn v. IKB Deutsch Industriebank AG,* 673 F.3d 76, 81 (2d Cir. 2012). Thus, 28 U.S.C. § 1782 is a proper and necessary method by which to obtain the critical evidence sought by Applicant.

Fourth and finally, any discovery under the subpoenas will not be onerous for Bank of Colorado. Courts may consider whether the discovery requests under § 1782 are "unduly intrusive or burdensome" and should be "rejected or trimmed." *Intel,* 542 U.S. at 265. In this instance, Applicant seeks information and documents from Bank of Colorado narrowly tailored to information concerning the accounts linked to Crypto Capital, Global Trade Solutions, LLC, their principals, agents, and related entities. It is unlikely that such information or documentation would be voluminous or difficult to search for and produce. Accordingly, this factor also weighs in favor of granting the instant Application.

## VI.    CONCLUSION

Based on the foregoing, Applicant respectfully requests that this Court grant the instant

Application in its entirety.


Dated: April 13, 2020

*s/Shannon Wells Stevenson*
**Shannon Wells Stevenson**
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, Colorado, 80202
Telephone:  303.892.9400
Facsimile: 303.893.1379
Email: shannon.stevenson@dgslaw.com

Michael Jason Lee
LAW OFFICES OF MICHAEL JASON LEE, APLC
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
Telephone: 858.550.9984
Facsimile: 858.550.9985
Email: Michael@mjllaw.com

Christopher J. Beal (State Bar No. 216579)
DILLON MILLER & AHUJA, LLP
5872 Owens Avenue, Suite 200
Carlsbad, California 92008
Telephone: 858.587.1800
Facsimile: 858.587.2587
Email: cbeal@dmalaw.com

*Attorneys for Applicant, iFINEX Inc.*